## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **(UNDER SEAL)** |
| | ) | |
| v. | ) | CRIMINAL NO. 1:14-CR-135 |
| | ) | |
| | ) | Count 1:    Conspiracy to Distribute 5 |
| MIGUEL ARNULFO VALLE VALLE, | ) | Kilograms or More of Cocaine |
|    a/k/a "El Colocho" and "AV," | ) | (21 U.S.C. §§ 841, 846) |
| | ) | |
| LUIS ALONSO VALLE VALLE, | ) | Count 2:    Conspiracy to Distribute Five |
|    a/k/a "LV," | ) | Kilograms or More of Cocaine |
| | ) | Knowing and Intending that it |
| JOSE INOCENTE VALLE VALLE, | ) | will be Unlawfully Imported |
|    a/k/a "Chente" and "Chentillo," | ) | into the United States |
| | ) | (21 U.S.C. §§ 959(a), 963) |
| MARLEN GRISELDA AMAYA ARGUETA, | ) | |
| | ) | Count 3:    Conspiracy to Engage in Money |
| MARIO ROJEL URBINA MIRANDA, | ) | Laundering |
|    a/k/a "MRU," | ) | (18 U.S.C. § 1956(h)) |
| | ) | |
| RAFAEL ANTONIO PINEDA SANTOS, | ) | Forfeiture Notice:    21 USC § 853; |
|    a/k/a "Tony Santos" and "Tony Pineda," | ) | 18 U.S.C. § 982 |
| | ) | |
| ARISTIDES DIAZ DIAZ, | ) | |
| | ) | |
| DIRLO NOLASCO ARGUETA, | ) | |
|    a/k/a "El Venado," | ) | |
| | ) | |
| DELIS ABNER MARTINEZ PALENCIA, | ) | |
| | ) | |
| JOSE ADALI AMAYA ARGUETA, | ) | |
| | ) | |
| JOSE RAUL AMAYA ARGUETA, | ) | |
| | ) | |
| OSMAN DONAY MARTINEZ GUEVARA, | ) | |
| | ) | |
| JOSE MANUEL LOPEZ MORALES, | ) | |
|    a/k/a "El Che," | ) | |
| | ) | |
| WILMER ALONZO CARRANZA BONILLA, | ) | |

1

ERLIS ANTONIO LEON CASTELLANOS,  )
    a/k/a "El Cabro,"  )
                     )

        Defendants.

## SUPERCEDING INDICTMENT

### JUNE 2014 TERM - at Alexandria, Virginia

### COUNT ONE

(Conspiracy to Distribute 5 or More Kilograms of Cocaine)

THE GRAND JURY CHARGES THAT:

From in or around 2005 through the date of this Indictment, the defendants, Miguel

ARNULFO Valle Valle (also known as "El Colocho" and "AV"), LUIS Alonso Valle Valle (also

known as "LV"), Jose Manuel Lopez MORALES (also known as "El Che"), JOSE INOCENTE

Valle Valle (also known as "Chente" and "Chentillo"), MARLEN Griselda Amaya Argueta,

MARIO Rojel Urbina Miranda (also known as "MRU"), Rafael Antonio Pineda SANTOS (also

known as "Tony Santos" and Tony Pineda"), Wilmer Alonzo CARRANZA Bonilla,

ERLIS Antonio Leon Castellanos (also known as "El Cabro"), ARISTIDES Diaz Diaz, DIRLO

Nolasco Argueta, Delis ABNER Martinez Palencia (also known as "El Venado"), Jose ADALI

Amaya Argueta, Jose RAUL Amaya Argueta, and OSMAN Donay Martinez Guevara, within the

Eastern District of Virginia and elsewhere, did unlawfully, knowingly and intentionally combine,

conspire, confederate, and agree among themselves and with others, both charged and uncharged

and known and unknown to the grand jury, to unlawfully, knowingly and intentionally distribute

five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine,

a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).[1]

## BACKGROUND

At all times relevant to this Indictment:

1.      ARNULFO led one of largest drug trafficking organizations in Honduras ("VALLE DTO"), responsible for the distribution of multi-ton quantities of cocaine into the United States valued at millions of U.S. dollars. ARNULFO maintained his base of operation for the VALLE DTO in Copan, a Department, or State, located in the north western region of Honduras along the border with Guatemala. The VALLE DTO's base of operation is strategically located within Copan because of its proximity to the North Atlantic coastal region and the border with Guatemala. The objective of the VALLE DTO and its members is to make as much money as possible by importing cocaine into the United States for further distribution.

2.      Colombia is responsible for the production of ninety percent of the cocaine that is imported into the United States. Honduras is a major transit country for Colombian cocaine, as well as other illegal narcotics. Large shipments of cocaine are delivered from Colombia to Honduras *via* non-commercial aircraft and maritime shipping routes. At least eighty percent of the primary flow of the cocaine trafficked to the United States first transited through the Central American corridor in 2012. Over eighty percent of all cocaine smuggling flights departing South America first land in Honduras. There is no substantial domestic drug market in the Central American countries and Mexico for cocaine, while there is robust demand for the drug in the United States. The Northern Atlantic coastal region of Honduras is a primary landing zone for drug-carrying flights. The region is strategically critical for narcotics trafficking and the VALLE

---

1 Each defendant will be referred to herein by the portion of his name that is in all capitalized letters in this paragraph.

3

DTO due to its remoteness, limited infrastructure, lack of government presence, and weak law enforcement institutions. Transshipment from the North Atlantic coastal region is facilitated by subsequent flights north as well as maritime traffic and land movement on the Pan American Highway.

3.      The price of cocaine increases at each stage of the supply chain as the cocaine is transported from Colombia to Honduras and further north to the United States. The incremental price increases enables multiple drug traffickers to make substantial profits on the shipments of cocaine.

4.      Honduras suffered from violence and a high homicide rate in 2012. The United Nations Office on Drugs and Crimes (UNODC) ranked Honduras as the country with the highest murder rate in the world, with an official murder rate of 82 per 100,000 inhabitants in 2011.

5.      A United States-Honduras maritime counternarcotics agreement and a bilateral extradition treaty remain in force, and in 2012 the Honduran Congress amended its Constitution to allow extradition of Honduran nationals for narcotics trafficking, organized crime and terrorism offenses.

6.      The VALLE DTO is comprised of several members of the Valle family, as well as other close associates, who perform various tasks and take on various roles in furtherance of the conspiracy:

          a)  ARNULFO is the leader of the VALLE DTO, and has been a substantial drug trafficker in Honduras since approximately 1998. ARNULFO manages the day to day operations of the VALLE DTO, maintaining trafficking routes, relationships with suppliers and clients, receipt and issuance of payment, employment of underlings, and avoidance of law enforcement detection;

b) LUIS is the brother of ARNULFO and the second in command of the VALLE DTO. LUIS shares responsibilities and profits with ARNULFO;

c) MARIO is a lieutenant in the VALLE DTO, personally responsible for coordinating the trafficking of thousands of kilograms of cocaine and the collection of millions of dollars in cocaine proceeds;

d) SANTOS is an employee of the VALLE DTO, responsible primarily for obtaining information on behalf of the VALLE DTO, including information about law enforcement cooperators, and pending law enforcement actions against the VALLE DTO;

e) CARRANZA is a Honduran police officer, associated with a law enforcement unit whose duties include assisting in matters bearing on the United States' interests in Honduras, he provides information obtained in the execution of his official duties to the VALLE DTO in exchange for bribes and other consideration.

f) MORALES is a Guatemalan drug trafficker who receives loads of cocaine from the VALLE DTO, and facilitates their transportation across the Guatemalan border;

g) JOSE INOCENTE is the brother of ARNULFO and LUIS and a direct importer of cocaine into the United States;

h) MARLEN is the wife of JOSE INNOCENTE and a direct importer of cocaine into the United States;

i) ERLIS is the husband of one of ARNULFO, LUIS, and JOSE INNOCENTE's sisters, and a member of the VALLE DTO, who is responsible for helping to transport and store cocaine and cocaine proceeds.

j)  ARISTIDES is a cocaine distributor supplied by and working on behalf of the VALLE DTO, responsible for sending cocaine directly to the United States;

k)  DIRLO is a cocaine distributor supplied by and working on behalf of the VALLE DTO, responsible for sending cocaine directly to the United States;

l)  ABNER is a cocaine distributor supplied by and working on behalf of the VALLE DTO, responsible for sending cocaine directly to the United States;

m)  ADALI is a cocaine distributor supplied by and working on behalf of the VALLE DTO, responsible for sending cocaine directly to the United States;

n)  RAUL is a cocaine distributor supplied by and working on behalf of the VALLE DTO, responsible for sending cocaine directly to the United States; and

o)  OSMAN is a cocaine distributor supplied by and working on behalf of the VALLE DTO, responsible for sending cocaine directly to the United States.

## WAYS, MANNERS AND MEANS OF THE CONSPIRACY

The primary purpose of the conspiracy was to make as much money as possible by trafficking cocaine through the areas controlled by the VALLE DTO in Honduras, and ultimately into the Eastern District of Virginia, and elsewhere within the United States. The defendants and other co-conspirators, charged and uncharged and known and unknown to the Grand Jury, used the following ways, manners and means, among others, to carry out this purpose:

7.  It was part of the conspiracy that the defendants and other co-conspirators, known and unknown to the grand jury, played different roles, took upon themselves different tasks, and participated in the affairs of the conspiracy through various criminal acts.

8.  It was part of the conspiracy that ARNULFO and LUIS trafficked cocaine in

various manners throughout the course of the conspiracy, modifying their method as availability

of supply, perceived risk of law enforcement detection, and profit making potential dictated.

9.     It was part of the conspiracy that ARNULFO and LUIS employed MARIO

URBINA and SANTOS, paying them a salary to perform various tasks and engage in various

criminal actions on behalf of the VALLE DTO. MARIO URBINA, in turn, managed his own

staff of employees who worked under his supervision on behalf of the VALLE DTO. SANTOS,

in turn, maintained an extensive network through which he obtained information that he provided

the VALLE DTO to further the conspiracy.

10.     It was part of the conspiracy that ARNULFO and LUIS sometimes supplied JOSE

INOCENTE with cocaine. JOSE INOCENTE and MARLEN sent cocaine directly into the

United States, with the assistance of ARISTIDES, DIRLO, ABNER, ADALI AMAYA, RAUL

AMAYA, and OSMAN, all of whom worked from Honduras.

11.     It was part of the conspiracy that JOSE INNOCENTE maintained a safe within

his residence to protect money received as part of the drug trafficking conspiracy.

12.     It was part of the conspiracy that the VALLE DTO worked with MORALES to

transport cocaine that the VALLE DTO had trafficked through Honduras, on to MORALES in

Guatemala, to then be trafficked on to Mexico and then to the United States.

13.     It was part of the conspiracy that the VALLE DTO and its individual members

maintained an arsenal of firearms to protect and further the operation of the VALLE DTO.

14.     It was part of the conspiracy that the VALLE DTO relied on violence, including

kidnapping and murder, as a means of intimidation to further the objectives of the conspiracy.

15.     It was part of the conspiracy that the VALLE DTO exercised influence over

individuals acting within an official capacity in Honduras by means of bribery, threats,

7

intimidation and violence.

16.     It was part of the conspiracy that CARRANZA used his position as a police officer to obtain information for and undertake official acts on behalf of the VALLE DTO.

17.     It was part of the conspiracy that cocaine trafficked by the VALLE DTO was sent directly from Honduras into the United States and sold to customers in the United States.

18.     It was part of the conspiracy that certain members of the VALLE DTO received drug proceeds through wire transfers initiated by co-conspirators in the United States.

19.     It was part of the conspiracy that certain members of the VALLE DTO received drug proceeds from Honduran, Guatemalan, and Mexican co-conspirators through bulk cash payments and through deposits in to Honduran banking institutions.

20.     It was part of the conspiracy that the charged co-conspirators laundered the proceeds of the cocaine sales in the United States in order to conceal their activities.

21.     It was part of the conspiracy that ARNULFO, LUIS and the other charged co-conspirators reinvested portions of their proceeds of U.S. cocaine sales into the cocaine production, transportation, and distribution business.

22.     It was part of the conspiracy that the members of the VALLE DTO relied on various forms of communication including cellular phone voice calls, text messaging, BlackBerry PIN to PIN communications, and in person meetings. In an effort to avoid the detection of law enforcement, the members of the VALLE DTO took certain safeguards with regard to their communications, including varying the forms of communication with which they conducted their drug trafficking, frequently changing their phone numbers and devices, using BlackBerry messenger communications which they understood that law enforcement could not intercept, subscribing to their devices in false names or aliases, and speaking in code when

8

discussing cocaine trafficking and associated crimes.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

In order to further the goals and purposes of the conspiracy, the defendants committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

23.     On or about March 16, 2009, the VALLE DTO sent cocaine from Honduras to Calexico, California, at least a kilogram of which was stamped with a unique stamp used by the VALLE DTO, "LAVA."

24.     On or about April 22, 2009, the VALLE DTO sent approximately 108 kilograms of cocaine from Honduras to Springfield, Illinois, at least some of which were stamped with a unique stamp used by the VALLE DTO, "LAVA."

25.     On or about May 1, 2009, the VALLE DTO sent cocaine from Honduras to Nogales, Arizona, at least a kilogram of which was stamped with a unique stamp used by the VALLE DTO, "LAVA."

26.     On or about August 13, 2009, the VALLE DTO sent approximately 6.5 kilograms of cocaine from Honduras to Sarita, Texas, at least some of which were stamped with a unique stamp used by the VALLE DTO, "LAVA."

27.     On or about February 19, 2012, DIRLO sent cocaine to the Eastern District of Virginia with a courier.

28.     On or about February 20, 2012, DIRLO, directed a co-conspirator in the United States to send cocaine proceeds to DIRLO by wiring the cocaine proceeds to DIRLO's wife and daughter, or by depositing the cocaine proceeds into an account held by DIRLO's wife at a Honduran banking institution.

29.     On or about March 7, 2012, MARLEN, OSMAN, and others sent approximately 3.5 kilograms of cocaine into the United States, employing a courier who delivered the cocaine to a co-conspirator in New York.

30.     On or about March 22, 2012, ABNER, ARISTIDES, and others sent approximately 3.1 kilograms of cocaine into the United States, employing a courier who entered the United States on a flight from Honduras to Dulles International Airport in Sterling, Virginia, within the Eastern District of Virginia.

31.     On or about March 22, 2012, JOSE INOCENTE, MARLEN, OSMAN, ABNER, ARISTIDES, and others communicated with associates about law enforcement's interception of the cocaine that had been sent with the courier to Dulles International Airport earlier that day.

32.     On or about February 25, 2012, ADALI communicated with a co-conspirator about a shipment of cocaine that ADALI had sent to the co-conspirator in the United States with a courier.

33.     On or about March 30, 2012, RAUL instructed a co-conspirator to send cocaine proceeds for cocaine that RAUL and others previously sent to the United States to RAUL through wire transfers in RAUL's name, and in the name of another individual.

34.     On or about April 20, 2012, a courier carrying approximately 1.3 kilograms of cocaine into the United States, on behalf of the VALLE DTO, was apprehended in Houston, Texas, with a final destination of Dulles International Airport in Sterling, Virginia, within the Eastern District of Virginia.

35.     On or about April 24, 2012, a courier employed by the VALLE DTO carried approximately 2.5 kilograms of cocaine into the United States, on a flight from Honduras to Miami, Florida.

10

36.     On or about April 25, 2012, JOSE INOCENTE, MARLEN, and others distributed approximately 1.9 kilograms to a courier in Honduras, with instructions that the courier bring the cocaine to the United States.

37.     On or about April 25, 2012, a courier working for the VALLE DTO imported approximately .9 kilograms of cocaine in to the United States, on a flight from Honduras to Houston, Texas.

38.     Throughout the conspiracy, JOSE INOCENTE, MARLEN, ARISTIDES, DIRLO, ABNER, ADALI, RAUL, OSMAN, and others known and unknown, received cocaine proceeds through wire transfers initiated in the Eastern District of Virginia, and elsewhere in the United States, a portion of which are summarized in the following table:

| Recipient | Recipient Location(s) | Originating Location(s) | # of Transactions | Total USD Value |
|---|---|---|---|---|
| JOSE INOCENTE | Copan, Honduras | Eastern District of Virginia, Maryland, Massachusetts | 11 | $12,600.00 |
| MARLEN | Copan, Honduras | Eastern District of Virginia | 19 | $21,550.00 |
| ARISTIDES | Copan, Honduras | Eastern District of Virginia, Maryland, Florida | 48 | $42,480.00 |
| DIRLO | Copan, Honduras | Eastern District of Virginia, Maryland, Georgia | 20 | $22,190.19 |
| RAUL | Copan, Honduras | Eastern District of Virginia, Maryland, Massachusetts | 26 | $36,655.00 |
| ADALI | Copan, Honduras | Eastern District of Virginia, Maryland, Massachusetts, | 54 | $51,663.00 |

|  |  | Texas |  |  |
|---|---|---|---|---|
| ABNER | Copan, Honduras | Eastern District of Virginia, Maryland, Massachusetts, Kentucky | 81 | $75,655.00 |
| OSMAN | Copan, Honduras | Eastern District of Virginia, Maryland, Massachusetts | 85 | $90,938.00 |

39.     On or about February 9, 2014, ARNULFO, MARIO URBINA, MORALES and others trafficked approximately 513 kilograms of cocaine through Honduras into Guatemala.

40.     On or about February 9, 2014, MARIO URBINA delivered an invoice to ARNULFO. ARNULFO instructed MARIO URBINA to tell MORALES to pay the invoice, which reflected that $6,475,000 was owed for the cocaine shipment.

41.     On or about February 9, 2014, CARRANZA worked to obtain information from police sources about an individual at the request of ARNULFO.

42.     On or about February 11, 2014, ARNULFO, LUIS, and SANTOS obtained identifying information about law enforcement cooperators from an associate of SANTOS, in exchange for $1,500.

43.     On or about February 12, 2014, ARNULFO, LUIS, MARIO URBINA and others trafficked approximately 200 kilograms of cocaine through Honduras.

44.     On or about February 13, 2014, ARNULFO, LUIS, and MARIO URBINA discussed identifying three male occupants of a Mazda pickup truck who were not authorized by the DTO to be driving through the area controlled by the VALLE DTO.

12

45.     On or about February 13, 2014, ARNULFO stated to MARIO URBINA to "Stop them . . . and put them in the cemetery," then later stated, "[l]et them come, just take photos of the car."

46.     On or about February 13, 2014, MARIO URBINA stopped the Mazda pickup truck, took a photograph of the three "unauthorized" men who were riding in the truck, and sent it to ARNULFO.

47.     On or about February 13, 2014, ARNULFO sent the photograph of the three "unauthorized" men to LUIS, who stated to ARNULFO, "Have to kill them outside of Florida." [Florida is a city in the department of Copan, Honduras.]

48.     On or about February 13, 2014, CARRANZA sent ARNULFO a photograph of the properties that law enforcement intended to raid.

49.     On or about February 18, 2014, ARNULFO, ERLIS and others trafficked approximately 500 kilograms of cocaine through Honduras and into Guatemala.

50.     On or about February 18, 2014, ARNULFO, MARIO URBINA, MORALES, and ERLIS facilitated the deposit of approximately $2,500,000 into an account at the Banco de Occidente in Honduras for cocaine that MORALES had obtained from the VALLE DTO.

51.     On or about February 19, 2014, a co-conspirator asked how much more money he owed ARNULFO for cocaine that the co-conspirator had received from the VALLE DTO. MARIO URBINA advised ARNULFO that the amount still owed was $1,615,700, and sent ARNULFO a handwritten ledger indicating the debt.

52.     On or about February 20, 2014, ARNULFO, LUIS, MORALES and others trafficked approximately 500 kilograms of cocaine through Honduras into Guatemala.

13

53. On or about February 27, 2014, ARNULFO and MORALES communicated about avoiding law enforcement detection by obtaining information directly from law enforcement.

54. On or about February 28, 2014, SANTOS provided information to ARNULFO about a pending law enforcement action against LUIS, ARNULFO, and the VALLE DTO, as well as information identifying an individual who had cooperated with law enforcement against the VALLE DTO. ARNULFO paid for the information by instructing that money be provided to one of SANTOS' sources of information.

55. On or about March 1, 2014, ARNULFO instructed an employee to destroy the cocaine trafficking invoices stored on one of the VALLE DTO properties in advance of what ARNULFO understood to be a pending law enforcement action against the VALLE DTO. ARNULFO told the employee to leave the guns on the property so that they could be moved during the night.

56. On or about March 4, 2014, SANTOS provided ARNULFO with the identity of a person who SANTOS said was cooperating with law enforcement against the VALLE DTO.

57. On or about March 13, 2014, SANTOS provided ARNULFO with information about imminent law enforcement surveillance of one of the VALLE DTO's properties, where SANTOS said law enforcement was looking for a suspected narcotics laboratory.

58. On or about March 17, 2014, ARNULFO orchestrated the murder of Jose Cristian Espinosa Erazo, in part because Espinosa was a rival to ARNULFO in the drug trafficking business.

59. On or about March 20, 2014, ARNULFO and others trafficked approximately 500 kilograms of cocaine through Honduras.

14

60.     On or about March 20, 2014, ARNULFO received the name and bank account number of an account at Banco de Occidente, into which drug proceeds could be deposited.

61.     On or about April 13, 2014, MARIO URBINA and others trafficked approximately 517 kilograms of cocaine through Honduras.

62.     On or about April 22, 2014, ARNULFO, MORALES, MARIO URBINA and others trafficked approximately 743 kilograms of cocaine through Honduras.

63.     On or about April 27, 2014, ARNULFO, MORALES, and others trafficked approximately 201 kilograms of cocaine through Honduras.

64.     On or about May 4, 2014, ARNULFO, MARIO, ERLIS, MORALES, and others transported cocaine proceeds via a vehicle containing approximately $2,300,000 and another vehicle containing approximately $2,700,000 through Guatemala, bound for the VALLE DTO in Honduras.

(All in violation of Title 21, United States Code, Section 846.)

15

COUNT TWO

(Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing
and Intending that it would be Unlawfully Imported into the United States)

THE GRAND JURY FURTHER CHARGES THAT:

65.     The allegations set forth in paragraphs 1 through 64 are realleged and
incorporated herein by reference.

66.     From in or about 2005 and continuing thereafter up to and including the date of
the filing of this Indictment, the exact dates being unknown to the Grand Jury, in Honduras,
Guatemala, Colombia and elsewhere, the defendants, Miguel ARNULFO Valle Valle (also
known as "El Colocho" and "AV"), LUIS Alonso Valle Valle (also known as "LV"), Jose
Manuel Lopez MORALES (also known as "El Che"), JOSE INOCENTE Valle Valle (also
known as "Chente" and "Chentillo"), MARLEN Griselda Amaya Argueta, MARIO Rojel Urbina
Miranda (also known as "MRU"), Rafael Antonio Pineda SANTOS (also known as "Tony
Santos" and Tony Pineda"), Wilmer Alonzo CARRANZA Bonilla, ERLIS Antonio Leon
Castellanos (also known as "El Cabro"), ARISTIDES Diaz Diaz, DIRLO Nolasco Argueta, Delis
ABNER Martinez Palencia (also known as "El Venado"), Jose ADALI Amaya Argueta, Jose
RAUL Amaya Argueta, and OSMAN Donay Martinez Guevara, and others, known and
unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and
agree to commit the following offense against the United States: to knowingly and intentionally
distribute five (5) kilograms or more of a mixture and substance containing a detectable amount
of cocaine, a Schedule II controlled substance, knowing and intending that such substance would

16

be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a).

(All in violation of Title 21, United States Code, Section 963).

17

## COUNT THREE

### (Conspiracy to Commit Money Laundering)

THE GRAND JURY FURTHER CHARGES THAT:

67.     The allegations set forth in paragraphs 1 through 64 are realleged and incorporated herein by reference.

68.     The objects of the money laundering conspiracy were to promote the carrying on of distribution of controlled substances, to collect and spend money earned from the unlawful sale of controlled substances, primarily cocaine, in such a way as to avoid detection, seizure and forfeiture by Honduras and the United States, and to conceal the true nature, location, source, ownership and control of the drug proceeds.

69.     Beginning in and around 2005, and continuing through in and around April 2014, in the Eastern District of Virginia and elsewhere, the defendants, Miguel ARNULFO Valle Valle (also known as "El Colocho" and "AV"), LUIS Alonso Valle Valle (also known as "LV"), Jose Manuel Lopez MORALES (also known as "El Che"), JOSE INOCENTE Valle Valle (also known as "Chente" and "Chentillo"), MARLEN Griselda Amaya Argueta, MARIO Rojel Urbina Miranda (also known as "MRU"), Rafael Antonio Pineda SANTOS (also known as "Tony Santos" and Tony Pineda"), Wilmer Alonzo CARRANZA Bonilla, ERLIS Antonio Leon Castellanos (also known as "El Cabro"), ARISTIDES Diaz Diaz, DIRLO Nolasco Argueta, Delis ABNER Martinez Palencia (also known as "El Venado"), Jose ADALI Amaya Argueta, Jose RAUL Amaya Argueta, and OSMAN Donay Martinez Guevara, and others known and unknown, did unlawfully and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the grand jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

18

(a)      to unlawfully and knowingly conduct financial transactions affecting interstate and foreign commerce, involving the proceeds of a specified unlawful activity, namely, a conspiracy to distribute cocaine, in violation of Title 21, United States Code, Section 846, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the conspiracy to distribute controlled substances, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1) and (B)(i);

(b)      to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

(c)      to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, that is, conspiracy to distribute cocaine, in violation of Title 21, United States Code, Section 846, from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful

19

activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i)

(All in violation of Title 18, United States Code, Section 1956(h).)

## FORFEITURE NOTICE

Any defendant, if convicted of the violations alleged in Counts 1, 2 or 3 of this Indictment, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853(a) and Title 18, United States Code, Section 982, any property constituting, or derived from, any proceeds each defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. This property includes, but is not limited to $50,000,000 in United States currency, representing proceeds that the defendants obtained in the course of cocaine distribution, as alleged in Count 1 of this Indictment, and in the course of the conspiracy alleged in Counts 2 and 3 of this Indictment.

(Pursuant to Title 21, United States Code, Section 853; Title 18, United States Code, Section 982).

A TRUE BILL\
Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

Foreperson

Dana J. Boente
Acting United States Attorney

By: _____
Lisa L. Owings
Assistant United States Attorney

_____
Dennis M. Fitzpatrick
Assistant United States Attorney

21